**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

------------------------------------X

THE UNITED STATES OF AMERICA :
*ex rel.* JIMMIE H. LENZ and :
 GARY M. SINDERBRAND :

     :  **FIRST AMENDED**
   **Plaintiffs,** :  **COMPLAINT UNDER**
     :  **FEDERAL FALSE CLAIMS ACT**
 v.   :  **19-cv-7241**
     :

WELLS FARGO & COMPANY :

     :  **FILED *IN CAMERA* AND**
and :  **UNDER SEAL PURSUANT**
     :  **TO 31 U.S.C. § 3730(b)(2)**

WELLS FARGO CLEARING SERVICES, LLC :
*dba* WELLS FARGO ADVISORS and :
WELLS FARGO ADVISORS FINANCIAL :  **DO NOT ENTER IN**
NETWORK, LLC :  **PACER**
     :

and :
     :  **DO NOT PUT IN PRESS BOX**

WELLS FARGO BANK, NA :
     :

   **Defendants.** :

------------------------------------X

# TABLE OF CONTENTS

I.   NATURE OF THE ACTION..................................................................... 1

II.  JURISDICTION AND VENUE................................................................ 4

III. PARTIES. ................................................................................................ 5

   A.  Plaintiff....................................................................................... 5

   B.  Relators. ...................................................................................... 5

   C.  Defendants. ................................................................................. 7

IV.  THE FALSE CLAIM ACT. .................................................................... 9

V.   FEDERALLY RELATED MORTGAGE LOAN FEE AND DISCLOSURE
    REQUIREMENTS.................................................................................. 10

   A.  No Referral Fees or Kickbacks.................................................. 10

   B.  Disclosure of Fees is Required. ................................................ 15

VI.  DEFENDANTS' WRONGFUL CONDUCT............................................ 20

VII. DAMAGES. ............................................................................................ 27

*THE   REMAINDER   OF   THIS   PAGE   INTENTIONALLY   LEFT   BLANK*

i

## FIRST AMENDED COMPLAINT

**COMES NOW**, through the undersigned counsel, Relators Jimmie H. Lenz and Gary M. Sinderbrand, on behalf of themselves and the United States of America ("United States"), bring this *qui tam* action under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* ("FCA"), the Real Estate Settlement Procedures Act ("RESPA"), the Truth In Lending Act ("TILA"), and the Dodd-Frank Wall Street Reform and Protection Act ("Dodd-Frank"), to recover monetary damages, civil penalties, and other remedies for violations related to Federal Mortgage Programs, including the Federal Housing Administration ("FHA"), a division of the United States Department of Housing and Urban Development ("HUD"); the Department of Veterans Affairs ("VA"); and the Federal Housing Finance Agency ("FHFA"), which is responsible for the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac") (collectively "Federal Mortgage Programs").

Relators hereby allege as follows:

## I. NATURE OF THE ACTION.

1. This is a *qui tam* action under the Federal False Claims Act, which was enacted in 1863 in response to "widespread corruption and fraud in the sales of supplies and provisions to the union government during the Civil War." 132 CONG. REC. H9382-03 (daily ed. Oct. 7, 1986) (statement of Rep. Glickman). The law allows a private person with knowledge of a fraud to bring an action in federal district court for herself and for the United States and States and to share in any recovery. The party is known as a Relator, and the action that a Relator brings is called a *qui tam*.

1

2. In this *qui tam*, Relators allege that Defendants Wells Fargo & Company ("WF&C"), Wells Fargo Clearing Services, LLC ("WFCS") and Wells Fargo Advisors, LLC ("WFA"), and Wells Fargo Bank ("WFB") (collectively "Wells Fargo" or "Defendants") knowingly made and caused to be made false statements and claims to the United States, beginning in at least 2009, by engaging in a fraudulent scheme to pay illegal kickbacks to obtain residential mortgage loans purchased or guaranteed by the United States. WFB and WFCS/WFA are affiliates of WF&C, but legally separate entities. WFB encompasses Wells Fargo Home Mortgage ("WFHM"). WFB/WFHM made false statements to conceal or otherwise failed to disclose the payment of unlawful kickbacks to WFA and its Financial Advisors, and wrongly disguised illegal kickbacks as fees paid for services provided in violation of RESPA, TILA, and the False Claims Act. These unearned financial incentive payments for referrals to the bank were subsequently paid to WFA and its Financial Advisors secreted in corporate ledgers and incentive compensation plans. As detailed below, WFB/WFHM wrongfully incentivized WFA and its Financial Advisors to sell federally backed mortgages by paying undisclosed kickbacks. Moreover, WFA and its FAs had the ability to alter the interest rate charged to federal mortgagees in order to increase or decrease WFA and its FAs' kickbacks. Significantly, Well Fargo allowed its financial advisors to artificially inflate the mortgage rate offered to borrowers in order to increase the amount of the kickback received from WFB/WFHM. In short, the higher the interest rate, the higher the kickback paid to WFA and its Financial Advisor by WFB/WFHM.

3. The loans in question are conventional conforming loans, meaning they meet the size, borrower creditworthiness, and other underwriting criteria set by Federal

2

Mortgage Programs that make the loans eligible for purchase and guarantee by Federal Mortgage Programs. The Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac") are the two largest purchasers of mortgages on the secondary market. In order to offer and sell conventional conforming loans, WFHM is required to certify to FHFA, FHA/HUD and the VA that it is in compliance with federal regulations, including but not limited to RESPA and TILA. These certifications were a requirement to be a federal mortgage service lender/servicer. If WFHM did not certify compliance with federal regulations, WFHM would not have been permitted to sell federal mortgages to the Government or mortgagees. Wells Fargo falsely certified compliance with federal regulations to the Government and hid these illegal financial incentives from the mortgagees and the Government, which purchased or guaranteed these kickback-tainted federal loans.

4.     Wells Fargo is the nation's fourth largest bank, holding the third position from 2015 through 2018. In 2017, Wells Fargo became the largest mortgage originator in the United States by volume of total single-family 1-4 loans, reporting $93 billion and over 270,000 loans.  The majority of Wells Fargo mortgages were conforming loans, primarily through refinancing. Those mortgages in turn were purchased or guaranteed by Fannie Mae and Freddie Mac, HUD, and the VA.

5.     As a result of Defendants' fraudulent course of conduct, as alleged herein, the United States and mortgagees have been and continue to be substantially damaged. Wells Fargo's unlawful kickback scheme undermines the very purpose of the Federal Mortgage Programs, including Fannie Mae and Freddie Mac, which were created by Congress to ensure, for example, that individuals and families purchasing homes in the

3

United States have a reliable, stable, and affordable supply of mortgage funds. As a function of their work, Fannie Mae and Freddie Mac aim to eliminate hidden fees, reduce interest rates paid by mortgagees, and generally reduce the costs of borrowing.

6.    Wells Fargo's unlawful kickback payments were not disclosed to the United States and mortgagees, thereby having a material impact on the decision of the United States to purchase or guarantee the kickback-tainted loans and the decision of mortgagees to agree to the terms of potentially artificially inflated interest rates.

7.    This First Amended Complaint shall be filed *in camera* and under seal pursuant to 31 U.S.C. § 3730(b)(2). It will not be served on Defendants until the Court so orders. A disclosure of substantially all material evidence and information Relators possess has been served on the Attorney General of the United States and the United States Attorney for the Southern District of New York in advance of filing this First Amended Complaint pursuant to 31 U.S.C. § 3730(b)(2) and Fed. R. Civ. P. 4.

## II. JURISDICTION AND VENUE.

8.    This Court possesses subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1345 and 31 U.S.C. §§ 3730 and 3732 because Relators seek remedies on behalf of the United States for Defendants' violations of 31 U.S.C. § 3729, some of which occurred in the Southern District of New York, and Defendants transact substantial business within the Southern District of New York.

9.    This Court may exercise personal jurisdiction over Defendants under N.Y. C.P.L.R. § 302(a).

10.    This First Amended Complaint has been timely filed within the period prescribed by 31 U.S.C. § 3731(b). The allegations and transactions set forth in this First

4

Amended Complaint have not been publicly disclosed prior to filing, in accordance with 31 U.S.C. § 3730(e).

11.    Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1391(b) and (c) because the Defendants reside, transact business, and/or are qualified to do business in this District. In addition, during the period challenged by this action, Defendants committed the acts proscribed by the False Claims Act in this judicial District.

## III. PARTIES.

### A. Plaintiff.

12.    Plaintiff United States of America brings this action by and through its administrative agencies, the United States Federal Housing Administration ("FHA"), a division of the United States Department of Housing and Urban Development ("HUD"); the Department of Veterans Affairs ("VA"); and the Federal Housing Finance Agency ("FHFA"), which is responsible for the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac"), which in turn are responsible for the administration of all Federal Mortgage Programs.

### B. Relators.

13.    Relator Jimmie H. Lenz was employed by Wells Fargo from 2010 until 2017, first as Chief Risk and Credit Officer for Wells Fargo Advisors, and then as Director of Technology Risk followed by Head of Predictive Analytics for Wealth and Investment Management. He has earned both a Master of Science in Finance and a Doctor of Business Administration-Finance from Washington University, St. Louis, as well as an undergraduate degree from the University of South Carolina. Relator Lenz has

5

passed seven securities industry qualification exams and was registered with FINRA for 25 years without a single disclosure. Relator Lenz has taught courses relating to financial innovation theory and practice at the Darla Moore School of Business, University of South Carolina, as well as served as a principal at Financial Risk Group, where he headed research efforts in financial services and power generation. During the first five years of his tenure at Wells Fargo, Relator Lenz had joint supervisory authority related to the approval of new products and services offered by WFA. He also was a member of the firm's executive and management committee with supervisory authority related to Wells Fargo's compensation plans. From 2015 to 2017, Relator Lenz developed and implemented strategic framework to understand and assess risks related to internal and external technology environments, as well as coordinated and had regular interaction with the Office of the Comptroller of the Currency ("OCC"), the Federal Reserve Bank ("FRB"), the Securities and Exchange Commission ("SEC") and the Financial Industry Regulatory Authority ("FINRA"), which monitored Defendants' compliance with Federal and State laws and regulations.

14.     By virtue of his positions and responsibilities with Wells Fargo, his routine interactions with other Wells Fargo employees, and his extensive experience, Relator Lenz became aware of Defendants' fraudulent conduct, from the perspective of a company-wide executive, as alleged herein. Relator Lenz routinely interacted with other employees, from executives to financial advisors, throughout the country. Pursuant to 31 U.S.C. §3730(e)(4)(B), Relator Lenz is an "original source" of the information provided herein regarding Defendants' illegal conduct in violation of federal laws. He has direct and independent knowledge of the allegations set forth herein. Relator states that the

6

information concerning Defendants' misconduct was not disclosed publicly prior to his disclosure to the United States.

15.     Relator Gary M. Sinderbrand was employed by Wells Fargo as a Financial Advisor ("FA") for Wells Fargo Advisors from 2008 until 2013, assigned to the Metro Northeast Region with an office in New York City. He has over 25 years of experience in the investment industry. In 2012, Relator Sinderbrand incorporated Mill Lane Management LLC ("Mill Lane"), a consulting company through which he provided training, coaching and consulting services to over 5,000 financial advisors and broker-dealers, including participants for clients including Merrill Lynch, Citi Group, UBS, Fidelity Advisors, American Funds, Federated Funds and RW Baird & Co.

16.     By virtue of his position and responsibilities with Wells Fargo, his routine interactions with other Wells Fargo employees, and his extensive experience, Relator Sinderbrand became aware of Defendants' fraudulent conduct, as alleged herein, from the perspective of a personally incentivized employee. Pursuant to 31 U.S.C. §3730(e)(4)(B), Relator Sinderbrand is an "original source" of the information provided herein regarding Defendants' illegal conduct in violation of federal laws.  He has direct and independent knowledge of the allegations set forth herein. Relator states that the information concerning Defendants' misconduct was not disclosed publicly prior to his disclosure to the United States.

### C. Defendants.

17.     Wells Fargo & Company ("WF&C") is a domestic multinational financial services company and its primary subsidiary is Wells Fargo Bank, NA ("WFB"), which is the fourth largest bank in the United States and is headquartered in Sioux Falls, South

Dakota. It currently operates over 8,000 branches in 36 states and the District of Columbia.[1] WFB advertises and provides multiple services in addition to banking, including student loans, credit cards, personal loans, mortgages and financial advisory services. Home loans are serviced through Wells Fargo Home ("WFHM"). In 2017 WFHM was the largest mortgage originator in the United States by volume of total single-family 1-4 loans, reporting $93 billion and over 270,000 loans.[2] Since at least the mid-2000s, Wells Fargo has been a leader in residential mortgages and has been subject to multiple enforcement actions based on their mortgage services.

18.     Wells Fargo Clearing Services, LLC[3] ("WFCS"), a wholly owned subsidiary of WF&C, offers investment products and services and is comprised of multiple financial services businesses, including Wells Fargo Advisors, LLC ("WFA") and Wells Fargo Advisors Financial Network, LLC ("WFAFN").[4] WFAFN engages independent financial advisors not employed by WFCS while WFA is WFCS's in-house network of financial advisors. WFCS is registered in Delaware and WFA is registered in Missouri, but both maintain their primary office at One North Jefferson, St. Louis, MO, 63103. WFA employs nearly 14,000 financial advisors ("FA") who have offices in all 50 states and the District of Columbia.[5]

## IV. THE FALSE CLAIM ACT.

---

[1] Currently, Wells Fargo has locations in Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Idaho, Illinois, Iowa, Kansas, Maryland, Minnesota, Mississippi, Montana, Nebraska, Nevada, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oregon, Pennsylvania, South Carolina, South Dakota, Tennessee, Texas, Utah, Virginia, Washington, Wisconsin and Wyoming.

[2] https://www.housingwire.com/articles/47251-here-are-the-top-10-lenders-that-dominated-2017

[3] The firm was initially registered as Wachovia Securities, LLC in Delaware in 1986 and in Missouri in 2003. In 2009, Wachovia Securities, LLC changed its name to Wells Fargo Advisors, LLC in Delaware and Missouri. In November 2016, Wells Fargo Advisors, LLC changed its name to Wells Fargo Clearing Services, LLC in Delaware and Missouri.

[4] https://www.wellsfargo.com/investing/wells-fargo-advisors/

[5] https://www.wellsfargoadvisors.com/about/firm.htm

8

19.     The False Claims Act, 31 U.S.C. §§ 3729-3733, provides, *inter alia*, that any person who (1) knowingly presents, or causes to be presented, to the United States a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim made to the United States; or (3) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States for a civil money penalty plus treble damages. 31 U.S.C. § 3729(a)(1)(A)-(B), (G).

20.     The False Claims Act also provides that any person who conspires to violate any provision of the Act is liable to the United States for a civil money penalty plus treble damages.  31 U.S.C. § 3729(a)(1)(C).

21.     The terms "knowing" and "knowingly" are defined to mean "that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A)(i)-(iii). These terms "require no proof of specific intent to defraud." 31 U.S.C. § 3729(b)(1)(B).

22.     The term "claim" is defined to mean "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (1) is presented to an officer, employee, or agent of the United States; or (2) is made to a contractor, grantee, or other recipient, if the

9

money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (a) provides or has provided any portion of the money or property requested or demanded; or (b) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded . . . ." 31 U.S.C. § 3729(b)(2)(A)(i)-(ii).

23.    The term "material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.   31 U.S.C. § 3729(b)(4).

## V. FEDERALLY RELATED MORTGAGE LOAN FEE AND DISCLOSURE REQUIREMENTS.

### A. No Referral Fees or Kickbacks.

24.    Congress enacted the Truth in Lending Act ("TILA") in 1968 and the Real Estate Settlement Procedures Act of 1974 ("RESPA") to protect consumers in their dealings with lenders and creditors. RESPA specifically was based on findings that significant reforms in the real estate settlement process were needed to ensure that consumers were provided with greater and more timely information on the costs of the process and were protected from unnecessarily high settlement charges caused by certain abusive practices found by Congress. *See* 12 U.S.C. § 2601(a).[6] As the Consumer Fraud Protection Bureau ("CFPB") noted, "Congress enacted RESPA in 1974 as a response to abuses in the real estate settlement process. Thus, a primary purpose of RESPA is to 'eliminat[e] … kickbacks or referral fees that tend to increase unnecessarily the costs of settlement services.' 12 U.S.C. 2601(b)(2)."[7] Following the 2008 housing crisis, the

---

[6] https://files.consumerfinance.gov/f/201301_cfpb_final-rule_servicing-respa.pdf, at p.23.
[7] https://files.consumerfinance.gov/f/201510_cfpb_compliance-bulletin-2015-05-respa-compliance-and-marketing-services-agreements.pdf

10

Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank") imposed new requirements related to mortgage servicing and amended both RESPA and TILA. Additionally, following the housing crisis of 2008, the Federal Government put the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac") under government conservatorship, formally making the entities government-sponsored enterprises ("GSEs"). Fannie Mae and Freddie Mac are governed by rules enumerated in the Code of Federal Regulations ("CFR") and RESPA.

25.     Until October 2015, the controlling regulations regarding federally related residential mortgage fees and disclosures were RESPA, TILA and Dodd-Frank. The CFPB was granted authority under RESPA, TILA and Dodd-Frank to regulate residential mortgages, among other areas. On November 20, 2013, CFPB issued the TILA-RESPA Final Servicing Rules[8] that went into effect on October 3, 2015. CFPB regulations, codified in the CFR, and attempted to streamline the process even further, for mortgagees to more readily understand the extent of fees charged during the settlement process. The RESPA Final Servicing Rule continues the power of Section 8 of RESPA, which deals with federally related mortgage loan fees, disclosure, and enforcement issues. In broad strokes, the CFR defines federally related mortgage loans as any loan secured by residential real property and is made in whole or in part by any lender that is either regulated or insured by any agency of the Federal Government.[9] As most residential loans end up federally related in some way through federal loan guarantees

---

[8] The RESPA Final Servicing Rule is the relevant rule for purposes of this filing as it deals with permitted and prohibited fees and their required disclosures throughout the mortgage process.
[9] 12 C.F.R. § 1024.2.

and mortgage funding consolidation, RESPA covers the vast majority of real estate transactions.

26.     Both Section 8 of RESPA and 12 C.F.R. § 1024.14[10] state that a mere referral of a settlement service would not permit one to receive a fee based on that referral alone.[11] Specifically, 12 C.F.R. § 1024.14 states:

> (b) No referral fees. *No person shall give and no person shall accept any fee, kickback or other thing of value* pursuant to any agreement or understanding, oral or otherwise, that business incident to or *part of a settlement service involving a federally related mortgage loan shall be referred to any person*. Any referral of a settlement service is not a compensable service, except as set forth in § 1024.14(g)(1). *A company may not pay any other company or the employees of any other company for the referral of settlement service business*. (emphasis added).

The statute defines referral as:

> (f) Referral. (1) A referral includes any oral or written action directed to a person which has the effect of affirmatively influencing the selection by any person of a provider of a settlement service or business incident to or part of a settlement service when such person will pay for such settlement service or business incident thereto or pay a charge attributable in whole or in part to such settlement service or business. (2) A referral also occurs whenever a person paying for a settlement service or business incident thereto is required to use (see § 1024.2, "required use") a particular provider of a settlement service or business incident thereto.

27.     In order for a fee to be charged in relation to a settlement service for a federally related mortgage loan (1) actual work must be performed and (2) the fee must be reasonable in relation to the market value of the services provided, otherwise it is an unearned fee or kickback, both of which are prohibited in Section 8 of RESPA. Examples

---

[10] Regulation X, which implements RESPA, is codified at 12 C.F.R. § 1024.

[11] 12 C.F.R. § 1024.14(g)(vii) and RESPA Section 8 permit "an employer's payment to its own employees for any referral activities." This is not relevant to the issues at hand since Wells Fargo makes clear on their website, in their SEC filings, and in promotional material that the FAs are employees of WFA and WFCS, but not WFB.

12

of actual services performed or "compensable services" were provided by the U.S. Department of Housing and Development RESPA Statement of Policy 1999-1.[12] The non-exhaustive list of compensable services are:

> (a)  Taking information from the borrower and filling out the application;
> (b)  Analyzing the prospective borrower's income and debts and pre-qualifying the prospective borrower to determine the maximum mortgage that the prospective borrower can afford;
> (c)  Educating the prospective borrower in the home buying and financing process, advising the borrower about the different types of loan products available, and demonstrating how closing costs and monthly payments could vary under each product;
> (d)  Collecting financial information (tax returns, bank statements) and other related documents that are part of the application process;
> (e)  Initiating/ordering VOEs (verifications of employment) and VODs (verifications of deposit);
> (f)  Initiating/ordering request for mortgage and other loan verifications;
> (g)  Initiating/ordering appraisals;
> (h)  Initiating/ordering inspections or engineering reports;
> (i)  Providing disclosures (truth in lending, good faith estimate, others) to the borrower;
> (j)  Assisting the borrower in understanding and clearing credit problems;
> (k)  Maintaining regular contact with the borrower, realtors, lender, between application and closing to appraise them of the status of the application and gather any additional information as needed;
> (l)  Ordering legal documents;
> (m)  Determining whether the property was located in a flood zone or ordering such service; and
> (n)  Participating in the loan closing.

These compensable services would be considered performed if: (1) the lender's agent or contractor took the application information and performed *at least five* additional items on the list (or substantially similar items); and (2) the payment was not a fee given for steering a customer to a particular lender disguised as compensation for purported "counseling type" services (taking the application plus performing only the additional

---

[12] https://archives.hud.gov/news/1999/rspntce.html.

services identified in (b), (c), (d), (j) and (k) above).[13]  No valid compensable services were performed here by WFA or its FAs.

28.     Under applicable law, any settlement service provider is prohibited from giving or receiving anything of value for the referral of business in connection with a mortgage or charging fees or markups when no additional service has been provided. To offer or accept a fee, compensable work must be performed and there must be evidence of the work exchanged for the fee documented in the file to evidence compliance. RESPA prohibits unearned fees for services not actually performed, including fee splitting.[14] It follows the prohibition of general unearned fees that those unearned fees may not be tied to the mortgage rate.[15] By paying WFA and its FAs kickbacks for the mere referral of the mortgagee to WFHM, Defendants violated the regulations on permissible fees. By additionally linking  WFA and its FAs' incentive compensation directly to the rate of the mortgage, Defendants directly incentivized WFA and its FAs to manipulate mortgage rates for their own gain. This violates multiple federal regulations, specifically enumerated in 12 C.F.R. §§ 1024 and 1026, Banks and Banking, Real Estate Settlement Procedures Act (Regulation X) and Truth in Lending (Regulation Z), and the False Claims Act.

---

[13] *Id.*

[14] 12 C.F.R. §1024.

[15] Applicable law permits "loan originators" to receive a fee tied to a "term of the transaction," which includes the interest rate. In that specific case, a fee is only permitted if the compensation is paid in the form of a contribution to a defined contribution or benefit plan that is a designated tax-advantaged plan, which is not how Wells Fargo paid the FAs' incentive fees. Notably, in 2013 and possibly other years, FAs were given an option on how to receive "awards" outlined in their Compensation Plan. FAs could choose to receive deferred compensation or payment in 84 monthly installments with an optional loan. Defendants did not comply with the form of payment permitted to loan originators, and they also did not comply with loan originator licensing and participation requirements. A loan originator must perform an enumerated number of actions in the mortgage process to earn a reasonable fee. See S.A.F.E. Mortgage Licensing Act-Federal Registration of Residential Mortgage Loan Originators (Regulation G) Part 1007. Alternatively, FAs earn their commission merely by the act of referral. It is clear, that while WFA may use the term loan originator for the FAs, the FAs do not qualify for the title or the benefits.

14

29.    A referral fee is not permitted "[i]f the payment of a thing of value bares no reasonable relationship to the market value of the goods or services provided . . . these facts may be used as evidence of a violation of section 8 and may serve as a basis for a RESPA investigation."[16] Any violation of 12 C.F.R. § 1024 is a violation of RESPA Section 8 (12 U.S.C. § 2607).[17] Violations of Section 8's anti-kickback, referral fees and unearned fees rules are subject to criminal and civil penalties. In a criminal case, a person who violates Section 8 of RESPA may be fined up to $10,000 and imprisoned up to one year. In a civil case, a person who violates Section 8 may be liable to the person charged for the settlement service an amount equal to three times the amount of the charge paid for the service.

### B. Disclosure of Fees is Required.

30.    In 2017, CFPB released final amendments to the TILA-RESPA Integrated Disclosure Rule ("TRID"), also known as "Know Before You Owe."[18] Prior to TRID, disclosures were required to be listed on the GFE, the TIL Disclosure, and the HUD-1. Two new forms were created to help borrowers understand the terms of their loan more clearly before closing. RESPA's GFE and TILA's TIL Disclosure were integrated into the Loan Estimate ("LE") and the Final TIL and the HUD-1 were integrated into the Closing Disclosure.[19] The LE is required to be provided by lenders 3 days after receiving a loan application. The Closing Disclosure is provided by the lender at closing and is designed to more clearly and more accurately state costs and fees, than the initial estimates in the LE.

---

[16] 12 C.F.R. §1024.14(g)(2).

[17] 12 C.F.R. §1024.14(a).

[18] https://www.consumerfinance.gov/about-us/newsroom/cfpb-finalizes-updates-know-you-owe-mortgage-disclosure/

[19] https://thelendersnetwork.com/trid-tila-respa-integrated-disclosure-rule-guide/

15

31.    Any fee that is charged is required to be disclosed to the mortgagee. While there are specified disclosure rules for legal fees charged to the customer and even fees paid by the lender, in this case, the unearned incentive fees tied to the mortgage rate are prohibited and, therefore, it is not enumerated where such a disclosure for an illicit payment would be made. Similarly, there are no rules governing where to disclose fees an accountant would charge for laundering money. The WFA and FA incentive fees, directly contradict the purpose of RESPA and TILA, and are violations of the federal mortgage regulations.

32.    The majority of mortgages in the United States are conforming loans, eligible for purchase and guarantee by Federal Mortgage Programs, including the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac"), the two largest purchasers of mortgages on the secondary market. The mortgages Fannie Mae and Freddie Mac purchase and guarantee follow CFPB's final rule and it is the servicer's responsibility to comply with CFPB.[20] In order to ensure compliance with the regulations, FHFA requires large volume lenders, such as Wells Fargo, to make annual reports on a number of residential mortgage factors, involving origination, notification and disclosure requirements, as well as fees and charges. Included in the annual reporting requirements, corporate officers state,

> "I certify that, to the best of my knowledge and after conducting a reasonable investigation, the Mortgagee does now, and did at all times throughout the Certification Period, comply with all HUD regulations and requirements necessary to maintain the Mortgagee's FHA approval as codified in 24 CFR § 202.5, HUD Handbook 4000.1 Sections I and V, as amended by Mortgagee Letter, and any agreements entered into between the Mortgagee and HUD, except for those instances of non-compliance, if

---

[20]http://www.freddiemac.com/singlefamily/service/mortgage_servicing.html;
https://www.fanniemae.com/content/guide/svc081617.pdf.

16

any, that the Mortgagee received explicit clearance from HUD to continue with the certification process."[21]

33.    Fannie Mae and Freddie Mac each additionally require certifications of compliance from federal mortgage lenders, including Wells Fargo, to even permit lenders to sell federal mortgages. Fannie Mae's controlling document to permit lenders to service mortgages is the Fannie Mae Selling Guide, which since at least 2010 has required:

> [t]he lender and (any sub-servicer or third-party originator it uses) must be aware of, and in full compliance with, all federal, state, and local laws (e.g., statutes, regulations, ordinances, administrative rules, and orders that have the effect of law, and judicial rulings and opinions) that apply to any of its origination, selling, or servicing practices or other business practices. . . that may have a material affect on Fannie Mae. Among other things, this means the lender must comply with any applicable law that addresses…truth-in-lending…[and] real estate settlement procedures…

Fannie Mae Selling Guide, A3-2-01, Compliance With Laws, dated December 1, 2010.[22] Additionally, there are similar requirements in the Fannie Mae Mortgage Selling and Servicing Contract from at least 2005-2017.

34.    Freddie Mac's Single-Family Seller/Servicer Guide also enumerates the requirement of compliance with federal regulations, and specifically with RESPA since 2011.[23] *See* Freddie Mac Single-Family Seller/Servicer Guide, 6.2 Compliance with applicable law, dated August 16, 2011. Freddie Mac further makes clear that the legal

---

[21] https://www.hud.gov/sites/documents/SFH_COMP_SUPERNONSUPER.PDF. Of note, this language reflects the certification requirements updated in 2016. The prior language was refined to focus on lender approval eligibility requirements, "I certify that, to the best of my knowledge and after conducting a reasonable investigation, the Mortgagee does now, and did at all times throughout the Certification Period, comply with all HUD-FHA regulations and requirements applicable to the Mortgagee's continued approval and operations, including those contained in HUD handbooks, Mortgagee Letters, Title I Letters, policies, and any agreements entered into between the Mortgagee and HUD, except for those instances of non-compliance, if any, that the Mortgagee timely reported to HUD during the Certification Periods and for which the Mortgagee received explicit clearance from HUD to continue with the certification process."

[22] Fannie Mae Single Guide 2011, *available at* https://www.cdfifund.gov/system/files/documents/fannie-mae-single-family-selling-guide.pdf (last visited October 22, 2025).

[23] Freddie Mac Single-Family Seller/Servicer Guide Section 1301.2(a), *available at* (https://guide.freddiemac.com/app/guide/section/1301.2) (2024) (last visited October 22, 2025).

17

effect of the Single-Family Seller/Servicer Guide is contractual. *See* Freddie Mac Single-Family Seller/Servicer Guide, 1.2 Legal effect of the Single-Family Seller/Servicer Guide, dated November 10, 2011. Freddie Mac clarifies that:

> [t]he Seller and the Servicer should carefully read the Purchase Documents [including the Guide]. The Seller and the Servicer acknowledge that Freddie Mac....purchase[s] Mortgages and trade[s] in any related security in reliance on the accuracy and truth of the Seller's and the Servicer's warranties and representations and on its compliance with the agreements, requirements, terms, and conditions set forth in the Purchase Documents.

Freddie Mac Single-Family Seller/Servicer Guide, 6.4 Reliance on the Seller and he Servicer, dated October 6, 2006.

35.     Fannie Mae and Freddie Mac guides and contracts are applicable on a loan level basis. As DOJ made clear in its Complaint-In-Intervention in *U.S. ex rel. O'Donnell v. Countrywide Fin. Corp. et al,*

> [i]n purchasing loans, GSEs rely on lenders' representations and warranties that their loans comply in all respects with the standards outlined in the GSE selling guides and lender sales contracts, which set forth underwriting, documentation, quality control and self-reporting requirements. Specifically, loans sold to Fannie Mae must comply with its Single Family Selling Guide and purchase contracts. Loans sold to Freddie Mac must comply with its Single-Family Seller/Servicer Guide and purchase contracts.

*U.S. ex rel. O'Donnell v. Countrywide Fin. Corp. et al,* 2012 WL 5235021 (S.D.N.Y. Oct. 24, 2012).

36.     There are also loan level certifications that include integrity of the data, borrower eligibility, personal review on manual underwriting, as well as compliance with federal mortgage regulations for all federal mortgages. For example, FHA/HUD and VA have their own similar certifications of compliance. HUD Form HUD-92900-A and VA Form 26-1802a were utilized from 2010 through at least 2017 contain the Lender's Certificate, which states that "[t]he undersigned certifies that to the best of its

18

knowledge...[i]t has not paid any kickbacks, fee or consideration of any type, directly or indirectly, to any party in connection with this transaction except as permitted under HUD regulations and administrative instructions."[24] The Lender's signature is placed below the disclaimer:

> I, the undersigned, as authorized representative of mortgagee at this time of closing of this mortgage loan, certify that I have personally reviewed the mortgage loan documents, closing statements, application for insurance endorsement, and all accompanying documents. I hereby make all certifications required for this mortgage as set forth in HUD Handbook 4000.4.

HUD Form HUD-92900-A and VA Form 26-1802a (2010).[25]

37.    Further, HUD Quality Control guidelines require mortgagees to report all fraud, material misrepresentations, and "Material Findings" involving violations of origination and servicing requirements.[26] "If, at the time the case is submitted for endorsement, HUD has evidence that there is fraud or misrepresentation on the part of the originating mortgagee, HUD will consider the certifications as fraudulent and will not endorse the mortgage for insurance." HUD Single Family Direct Endorsement Program Handbook (4000.4), Assurance of Endorsement 1-3;[27] *see also U.S. v. Anchor Mortg. Co.*, 2010 WL 3184210 (N.D. Ill. 2010), Ex. 23 ("The government has proven that Anchor falsely certified to HUD that it had paid no improper referral fees. Anchor made both an express certification to this effect via the form that accompanied the direct-endorsed loans and an implied certification via the form's catch-all language

---

[24] *See* Addendum to Uniform Residential Loan Application (HUD 92900-A Form).

[25] HUD Form 92900-A.

[26] *See* Updated Quality Control Section of HUD Handbook 4000.1.

[27]    HUD    Single    Family    Direct    Endorsement    Program    (4000.4),    *available    at* https://www.hud.gov/hudclips/handbooks/housing-4000-4#close (last visited October 22, 2025).

stating that it was making all the certifications required by section 4000.4 of the HUD Handbook.").

38.    Defendants made false certifications and representations to the Government by misrepresenting their eligibility to service federal mortgages and failing to disclose the unlawful kickbacks, which was material to the decision of the United States to purchase or guarantee the kickback-tainted loans.

## VI. DEFENDANTS' WRONGFUL CONDUCT.

39.    Beginning in at least 2009, Wells Fargo knowingly made, and caused to be made, material false statements to the United States related to the payment of illegal kickbacks to obtain residential mortgage loans purchased or guaranteed by the United States. These unearned kickbacks for referrals to the bank were subsequently credited to WFA and its FAs by the bank. Specifically, Wells Fargo failed to disclose its scheme incentivizing WFA and its FAs to sell federally backed mortgages through annual lending incentive goals requiring WFA and its FAs to refer a certain number of mortgages to WFHM from their clients or the public at large annually. If the goals were attained, WFA and its FAs gained substantial compensation in the form of kickbacks. To the mortgagees' detriment, Wells Fargo tied FA compensation to the interest rates charged to the mortgagee and otherwise wrongfully disguised the kickbacks as fees paid for services provided. Additionally, Wells Fargo allowed each FA complete discretion to artificially deflate or inflate a mortgagee's interest rate up to 75 basis points for the sole purpose of increasing the kickback received for the loan origination, resulting in direct financial harm to the borrower.[28]   WFA and its FAs were compensated by the bank for closed referrals. Wells Fargo failed to disclose these unlawful financial arrangements to

---

[28] 75 basis points was the standard range available to FAs from at least 2008 until 2013.

mortgagees in required disclosure statements, while also concealing the information from the Federal Mortgage Programs.

40.    The majority of Wells Fargo mortgages were conforming loans, primarily through refinancing. Those mortgages in turn were purchased or guaranteed by Fannie Mae, Freddie Mac, HUD, and the VA. Fannie Mae and Freddie Mac require mortgage lenders/servicers to comply with federal regulations, including RESPA, to be eligible to participate in mortgage lending with Fannie Mae and Freddie Mac. Further both Fannie Mae and Freddie Mac require that the mortgages they purchase or guarantee be subject to annual reporting requirements to CFPB related to a number of residential mortgage factors, including origination, notification and disclosure requirements, as well as fees and charges.[29] Defendants falsely certified compliance with federal regulations to Fannie Mae, Freddie, Mac, HUD, and the VA, including but not limited to RESPA and TILA, and further did not reveal the fees discussed herein to the WFA clients verbally or on federal disclosure forms. Upon information and belief, Defendants also made false statements in their annual reports to CFPB related to Fannie Mae and Freddie Mac eligibility. The mortgages purchased or guaranteed by Fannie Mae and Freddie Mac are subject to CFPB's final rule and it is the servicer's responsibility to comply.

41.    Wells Fargo's unlawful kickback scheme undercuts Fannie Mae and Freddie Mac's very purpose. Wells Fargo steered federally-backed mortgages to itself through WFA and its FAs, while simultaneously and artificially inflating the cost of the

---

[29] Notably, in Wells Fargo's 2018 10K, under regulatory matters it states "[w]ith respect to residential mortgage lending, the CFPB issued a number of final rules implementing new origination, notification, disclosure and other requirements, as well as additional limitations on the fees and charges that may be increased from the estimates provided by lenders...The CFPB also expanded the transactions covered by the rule and increased the reporting frequency from annual to quarterly for large volume lenders, such as Wells Fargo, beginning January 1, 2020."

21

loans to its clients. The unlawful incentive compensation kickback payments were not disclosed to the United States, though such information would have a material impact on the decision of the United States to purchase or guarantee the kickback-tainted loans.

42.     Defendants had uniform mortgage services incentive plans and goals for WFA and its FAs nationwide. Well Fargo sent routine reminders to WFA and its FAs, including emails, weekly and monthly compensation statements or "runs" that listed current goals and compensation achievements and requirements, and WFA Lending Liaisons- attended weekly FA meetings to remind FAs how simple and profitable Defendants were making it for them to sell mortgages to their clients. Additionally, the FAs were ranked weekly by the number of mortgages they sold and the amount of their commission. A weekly update spreadsheet was generated, titled PCG YTD Lending Credits, that listed the FA Name, Region, Market, Branch, FA Rank, Total Lending Credits and Total Dollars. The chart further broke down Lending Credits into Mortgage Lending Credits and Mortgage Dollars, as well as Home Equity Lending Credits and Home Equity Dollars. These charts ranked every FA by production in Lending and was viewable by any FA at any time, an additional incentive for FAs to hit their lending goals. FAs were incentivized with specific goals, but could significantly surpass those goals, sometimes earning eight times their goal amount. [30]

43.     To facilitate this scheme, Wells Fargo maintained a central "client server" platform known as "Smart Station"[31] and an intranet known as Infomax. In order to

---

[30] As an example, in 2014, Steven Sinderbrand, Relator Sinderbrand's brother and former partner, had a Lending Sales Credits goal of $7,500, but earned over $60,000 in commissions, most likely almost entirely from mortgage products. In 2015, Steven Sinderbrand had a $12,000 production credit that would be paid out according to a pre-set percentage, in this case, about 48%. This resulted in close to $6,000 paid through W2 income and $20,000 paid into his deferred compensation, all as bonus payment for transacting in Wells Fargo's prioritized product areas.

[31] https://www.firstclearing.com/advisor-workstation.

22

initiate the mortgage process, Wells Fargo instructed WFA and its FAs to enter the client's name into the Client/Prospect Info screen and then a pre-filled mortgage application with all of the information from the Client/Prospect Info screen would be generated. The FA would then enter certain basic terms into the form, such as amount, term, market value, estimated credit quality, location of property, primary or secondary home and cash out options. The Client/Prospect Info screen is updated each time an FA interacts with a potential mortgagee.

44.    WFA and its FAs also had the ability to search and sort the client server based on any parameter, including high level detail on client liabilities or more specific searches such as everyone with a non-Wells Fargo mortgage with an interest rate of 6% or greater and 15 years or more. Additionally, the local WFA manager had access to the Client/Prospect Info for the entire office, as did each step up the WFA management chain. Ultimately, the WFA CEO had access to all information regarding potential mortgagees, down to an individual's interest rates on their current home loan, all provided to WFA by WFHM. The system has facilitated and promoted cross selling and referrals across Wells Fargo's businesses.

45.    Based on the information entered by the FA, WFHM immediately provided mortgage options for the borrower based on client specifics and the type of mortgage sought. For each mortgage option, the platform had three columns. The first column had the WFA rate, which automatically inflated the WFHM "base rate" by 25 basis points. In most cases, WFHM allowed WFA and its FAs to further adjust this column up to 75 basis points or down to zero basis points. This ability to artificially increase or decrease the rate was done by WFA and its FAs solely to adjust the FAs

23

incentive fee and was another *hidden cost* to the client. This is a similar column to one that appears when FAs are selling bonds and could adjust the interest rate to adjust their commission. The second column showed the number of basis points the prior column was set above the "base rate" that would ultimately be the basis of WFA and its FAs' fee or "FA Production Credit". The third column showed the FAs' fee in dollar amount.

46.     WFA and its FAs chose the interest rate and type of WFHM mortgage to present to the potential mortgagee. Specifically, WFHM allowed WFA and its FAs to alter the "FA Production Credit" for each potential mortgagee, as illustrated here:

   a. Mortgagee A has $10,000 in mutual funds and wanted to borrow $400,000 with $20,000 down for an FHA loan. If the FA wanted to waive his or her commission for this borrower, WFA managerial approval was required generally. However, no WFA managerial approval was required if the FA increased the interest rate up to .75%.

   b. Mortgagee B has $10 million in assets, generates $80,000 per year in fees to WFA and wants to borrow $1 million. If the FA wanted to "zero" out the commission, but still get paid, a WFA manager was authorized to make this exception based on the high value of the client.

47.     For both examples, the FA Production Credit could be artificially altered by the FA with or without approval for the sole benefit of WFA and its FAs. Once the mortgagee accepted the FA's chosen rate, the FA would adjust the FA Production Credit column accordingly. Upon final adjustment, the Infomax screen turned into a "pre-application" and was routed to the WFHM 800 call center, and a WFHM representative completed and submitted the application with the potential mortgagee.[32] As a general matter, once the application was sent to WFHM, WFA and its FAs had completed their "services".

---

[32] Beginning in 2013, local mortgage specialists would be alerted to the submission and would reach out the FA, especially for larger clients, such as Client B.

24

48.     Upon the closing of the mortgage, WFHM paid WFA and its FAs the incentive fee aka kickback—the FA's compensation was recorded in the FA's compensation statement. The FA compensation was noted by Compensation Category Name "Lending Services", which broke out Daily PEG Revenue, Daily Net Revenue, MTD PEG Revenue, MTD New Revenue, YTD PEG Revenue and YTD Net Revenue.[33] This fee or kickback directly linked to the percentage of basis points over the WFHM "base rate" and was not disclosed to the mortgagee or to the United States. Ultimately, this action by WFA and its FAs created a kickback for WFA and its FAs and resulted in an increased monthly cost to the mortgagee for the duration of the mortgage that could compound up to 30 years depending on the terms of the mortgage.

49.     Wells Fargo paid hundreds of millions of dollars in unlawful kickbacks to WFA and its FAs under this scheme. These unearned financial incentive payments for referrals to the bank were subsequently paid out to WFA and its FAs by the bank through corporate ledgers and incentive compensation plans. For example, just to the Wells Fargo Private Client Group ("PCG") alone, Wells Fargo paid kickbacks in the amount of $37 million in 2013, $30 million in 2014, and $49 million in 2015. These kickbacks covered all lending and banking services commissions, but the vast majority of the money went to fees on mortgage commissions, all of which were not disclosed to the mortgagees or to the United States. This arrangement makes sense because WFB/WFHM and WFA are legally separate entities, yet WFA is forced to have its employees work on WFB/WFHM product and receive compensation for that work. It would be make no financial sense for WFA to compensate its FAs for work WFA reaped no benefit from, so WFB/WFHM paid kickbacks for closed mortgages to WFA and its FAs.

---

[33] At least from 2013 until 2015, the Compensation Category Code for Lending Services was 650.

25

50.     The kickbacks steered business to WFHM, and when the value of the kickback was tied directly to the rate on the loans, Wells Fargo incentivized WFA and its FAs to artificially inflate the value of the loans, which were securitized and sold by WFHM to third parties and guaranteed by the United States.

51.     Defendants' kickback scheme was well known and embraced by senior management and brokers.  Relator Lenz recollects that the WFHM Lending Liaisons were "ramped up" around 2015 to further push WFA and its FAs to sell mortgages and Relator Lenz recalls multiple FAs and WFA branch managers complaining to him about Wells Fargo's incentive policies.  A member of the executive/operating committee, Relator Lenz recalls weekly meetings where the 10-16 executives discussed revenues, including goals and incentives.[34] This committee further had quarterly meetings with WFA Head of Risk Review David Carroll where mortgages were discussed and then that presentation was given quarterly to regulators. As a member of the executive/operating committee, Relator Lenz voted on new products and services and raised the negative issues regarding the incentives in those executive meetings.

52.     Significantly, Relator Lenz raised concerns regarding certain Wells Fargo incentive programs, telling executive committee members that they were incentivizing bad behavior, but his concerns were rejected or otherwise ignored. He has personal knowledge that compensation targets were adjusted annually by the WFA Private Client Group ("PCG") and that emails, compensation statements, and mortgage applications are maintained by Wells Fargo. Specifically, WFA PCG, as well as Lending and Banking Services would have charts showing WFA and its FAs' earnings for mortgage incentives.

---

[34] The name of the executive committee was changed around 2013 to be the operating committee.

26

53.     Based on Relators' experience and the information to which they had access, they conservatively estimate hundreds of thousands of instances of prohibited fees charged by the 14,000 FAs nationwide.  By comparing the mortgage applications to the prevailing interest rates at the time, on similar homes in similar geographic areas,[35] Relators can identify individual mortgagees wrongly charged artificially inflated interest rates.  Additionally, artificially inflated rates can be identified by reviewing FA compensation statements the week of each mortgage closing. Relators have knowledge of how WFA maintains its compensation and mortgage records.

## VII.   DAMAGES.

54.     The United States has suffered and continues to suffer damages as a result of the acts and practices of Defendants, as described herein, in presenting, causing to be presented, and conspiring to present false and fraudulent claims, statements, and records to the United States for federally related mortgage loans that generated illegal kickbacks and artificially inflated interest rates.

55.     Defendants' false statements were material to the decision of the United States to purchase or guarantee Defendants' federally related mortgage loans, as described herein.

56.     Defendants profited unlawfully from the payment of the false and fraudulent claims by the United States.

57.     Damages to the United States and mortgagees are substantial.

---

[35] Relator Lenz notes that the U.S. Census and American Community survey tracked home sales and home prices for every county in the United States, which could be an additional source of information.

27

## COUNT I
## VIOLATIONS OF THE FALSE CLAIMS ACT
### 31 U.S.C. § 3729(a)(1)(A)

58.    Relators restate and reallege the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

59.    The False Claims Act, 31 U.S.C. § 3729(a)(1)(A), provides in relevant part that any person who:

> knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval . . .

> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 . . . plus three times the amount of damages which the Government sustains because of the act of that person. . . .

60.    By virtue of the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to Federal Mortgage Programs to which they were not entitled.  Defendants knew that these claims for payment were false, fraudulent, or fictitious, or were deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

61.    Each claim presented or caused to be presented for federally related mortgage loans that generated illegal kickbacks and artificially inflated interest rates challenged herein represents a false or fraudulent claim for payment under the FCA.

62.    Unaware that Defendants submitted false statements to conceal their misconduct and falsely certified compliance with laws and regulations despite pervasive and substantial non-compliance, the United States paid and continues to pay the false claims submitted by Defendants for kickback-tainted federally related mortgage loans.

28

Defendants' fraud and false statements were material to the decision of the United States to purchase or guarantee Defendants' kickback-tainted federally related mortgage loans.

63.    In reliance on the accuracy of Defendants' statements, records, data, representations, and certifications, the United States has paid said claims and has suffered financial losses as a result of these acts by Defendant.

## COUNT II
## VIOLATIONS OF THE FALSE CLAIMS ACT
## 31 U.S.C. § 3729(a)(1)(B)

64.    Relators restate and reallege the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

65.    The False Claims Act, 31 U.S.C. § 3729(a)(1)(B), provides in relevant part that any person who:

> knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim . . .
>
> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 . . . plus three times the amount of damages which the Government sustains because of the act of that person. . . .

66.    By virtue of the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent records or statements material to false or fraudulent claims for federal purchase or guarantee of federally related mortgage loans that generated illegal kickbacks and artificially inflated interest rates to which they were not entitled. Defendants knew that the records and statements were false, fraudulent, or fictitious, or were deliberately ignorant of the truth or falsity of the records and

29

statements, or acted in reckless disregard for whether the records and statements were true or false.

67. Each false or fraudulent record or statement material to a false or fraudulent claim for purchase or guarantee of kickback-tainted federally related mortgage loans challenged herein represents a false or fraudulent claim for payment under the FCA.

68. Unaware that Defendants submitted false records or statements to conceal their misconduct and falsely certified compliance with laws and regulations despite pervasive and substantial non-compliance, the United States paid and continues to purchase or guarantee the false claims submitted for Defendants' kickback-tainted federally related mortgage loans. Defendants' fraud and false statements were material to the decision of the United States to purchase or guarantee Defendants' kickback-tainted federally related mortgage loans.

69. In reliance on the accuracy of Defendants' statements, records, data, representations, and certifications, the United States has purchased or guaranteed said kickback-tainted federally related mortgage loans and has suffered financial losses as a result of these acts by Defendants.

30

## COUNT III
## VIOLATIONS OF THE FALSE CLAIMS ACT
## 31 U.S.C. § 3729(a)(1)(C)

70.     Relators restate and reallege the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

71.     The False Claims Act, 31 U.S.C. § 3729(a)(1)(C), provides in relevant part that any person who:

> conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G) . . .
>
> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 . . . plus three times the amount of damages which the Government sustains because of the act of that person. . . .

72.     By virtue of the acts described herein, Defendants conspired to commit violations of 31 U.S.C. §§ 3729(a)(1)(A) and (B) by knowingly presenting, or causing to be presented, false or fraudulent claims for payment by knowingly making, using, or causing to be made or used, false records or statements material to false or fraudulent claims. Defendants knew that these claims were false, fraudulent, or fictitious, or were deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

73.     Unaware of the conspiracy to submit false records and/or statements to conceal their misconduct and falsely certified compliance with laws and regulations despite pervasive and substantial non-compliance, the United States paid and continues to purchase or guarantee the false claims submitted for Defendants' kickback-tainted federally related mortgage loans. Defendants' fraud and false statements were material to

31

the decision of the United States to purchase or guarantee Defendants' kickback-tainted federally related mortgage loans.

74.    In reliance on the accuracy of Defendants' statements, records, data, representations, and certifications, the United States has paid said claims and has suffered financial losses as a result of these acts by Defendants.

## PRAYER AS TO COUNTS I-III

WHEREFORE, Relators pray that this District Court enter judgment on behalf of Relators and against Defendants in Counts I-III, respectively, as follows:

a.    Damages in the amount of three times the actual damages suffered by the United States Government as a result of each Defendants' conduct;

b.    Civil penalties against Defendants, respectively, equal to not less than $5,000 and not more than $10,000, adjusted for inflation according to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, for each violation of 31 U.S.C. § 3729;

c.    The fair and reasonable sum to which Relators are entitled under 31 U.S.C. § 3730(b); additionally, Relators are entitled, in equity, to recover attorneys' fees from the fund created for non-participating beneficiaries (those not contributing material time and expense to generating any settlement or recovery from any Defendants) under the Common Fund doctrine to be paid from the recovery fund generated for such non-participatory beneficiaries from Defendants;

d.    All costs and expenses of this litigation, including statutory attorneys' fees and costs of court;

32

e.      Pre-judgment and post-judgment, as appropriate, interest at the highest rate allowed by law;

f.      Relators' individual damages, if any, which may be alleged; and

g.      All other relief on behalf of Relators or the United States Government to which they may be justly entitled, under law or in equity, and the District Court deems just and proper.

## COUNT IV
## UNJUST ENRICHMENT

75.     Relators restate and reallege the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

76.     Relators, on behalf of the United States, claim the recovery of all monies by which Defendants have been unjustly enriched, including profits earned by Defendants because of federally related mortgage loans that generated illegal kickbacks, artificially inflated mortgage interest rates and purchases or guarantees made by the United States.

77.     By obtaining monies as a result of its violations of federal and state law, Defendants were unjustly enriched, and are liable to account and pay such amounts, which are to be determined at trial, to the United States.

## PRAYER AS TO COUNT IV

WHEREFORE, Relators pray that this District Court enter judgment on behalf of Relators and against Defendants in Count IV as follows:

a.      Damages sustained by the United States, including the amounts Defendants unlawfully obtained;

33

b.    All costs and expenses of this litigation, including statutory attorneys' fees and costs of court;

e.    Pre-judgment and post-judgment, as appropriate, interest at the highest rate allowed by law;

f.    Relators' individual damages, if any, which may be alleged; and

g.    All other relief on behalf of Relators or the United States Government to which they may be justly entitled, under law or in equity, and the District Court deems just and proper.

## DEMAND FOR JURY TRIAL

Relators demand trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure and the Seventh Amendment to the U.S. Constitution.

Respectfully submitted,

*Melissa S. Fox / AMB*

Andrew M. Beato (DC Bar 469097)
ABeato@steinmitchell.com
Melissa Sussman Fox (NY Bar 4507729)
*Admitted to practice in the United States District Court for the Southern District of New York*
MFox@steinmitchell.com
STEIN MITCHELL BEATO & MISSNER LLP
2000 K Street, N.W.
Suite 600
Washington, D.C.  20006
(202) 737-7777 (telephone)
(202) 296-8312 (fax)

*Counsel for Relators*

October 27, 2025

34

## CERTIFICATE OF SERVICE

I certify that on this 27th day of October 2025, a true and correct copy of the foregoing First Amended Complaint was filed under seal with the Clerk of Court. Service of this First Amended Complaint shall be made to the following parties listed below by U.S. Certified Mail, Return Receipt Requested:

| | |
|---|---|
| The Honorable Pam Bondi<br>United States Attorney General<br>U.S. Department of Justice<br>950 Pennsylvania Avenue, NW<br>Washington, DC 20530-0001 | Jay Clayton<br>United States Attorney<br>United States Attorney's Office<br>86 Chambers Street<br>Third Floor<br>New York, NY 10007 |

Andrew M. Beato
Melissa Sussman Fox

35